RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0314p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BRITTON C. BROWN; SANDRA K. BROWN;
CAROL A. LINDHUBER; SHIRLEY J. REED;
JOHN L. DELGADO, for themselves and all
others similarly situated,

          *Plaintiffs-Appellants,*

    v.

OWENS CORNING INVESTMENT REVIEW
COMMITTEE; OWENS CORNING BENEFITS
REVIEW COMMITTEE,

          *Defendants,*

OWENS CORNING SAVINGS AND SECURITY
PLAN; OWENS CORNING SAVINGS PLAN;
RICHARD C. TOBER; DOMENICO CECERE;
FIDELITY MANAGEMENT TRUST COMPANY;
DAVID JOHNS; EDWARD MIRRA; STEVEN
STOBEL; MICHAEL THAMAN,

          *Defendants-Appellees.*

No. 09-3692

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 06-02125—Jack Zouhary, District Judge.

Argued: March 10, 2010

Decided and Filed: September 27, 2010

Before: COLE, GILMAN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gregory Yann Porter, BAILEY & GLASSER, LLP, Washington, D.C, for
Appellants. Erin E. Kelly, SIDLEY AUSTIN LLP, Chicago, Illinois, Howard Shapiro,
PROSKAUER ROSE LLP, New Orleans, Louisiana, for Appellees. **ON BRIEF:**
Gregory Yann Porter, BAILEY & GLASSER, LLP, Washington, D.C, Bryan T. Veis,
McTIGUE & VEIS LLP, Washington, D.C., for Appellants. Erin E. Kelly, Walter C.

Carlson, John M. George, Jr., SIDLEY AUSTIN LLP, Chicago, Illinois, Howard Shapiro, Robert W. Rachal, Charles F. Seemann III, PROSKAUER ROSE LLP, New Orleans, Louisiana, Edward A. Brill, PROSKAUER ROSE LLP, New York, New York, Jennifer J. Dawson, MARSHALL & MELHORN LLC, Toledo, Ohio, William M. Connelly, Steven R. Smith, Janine T. Avila, CONNELLY, JACKSON & COLLIER LLP, Toledo, Ohio, for Appellees.

GILMAN, J., delivered the opinion of the court, in which COLE, J., joined. WHITE, J. (pp. 19-23), delivered a separate opinion concurring in all sections except for Section II.C. and in the result of the majority opinion.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.  A number of former Owens Corning (OC) employees (the Plaintiffs) brought a class-action lawsuit against the fiduciaries of their retirement plans pursuant to the Employee Retirement Income Security Act (ERISA), alleging that the fiduciaries failed to protect plan participants by not divesting the plans of OC stock before the shares became virtually worthless when the company filed for bankruptcy.  The fiduciaries filed motions to dismiss, based in part on the defense that the claims against them were barred by ERISA's three-year statute of limitations.  Their motions were later converted by the district court into motions for summary judgment.

Although the district court originally denied the motions for summary judgment, it reversed itself after the fiduciaries filed a motion to reconsider.  The court held that the Plaintiffs' claims against the fiduciaries were time-barred because the Plaintiffs had actual knowledge of all the relevant facts more than three years before filing their lawsuit.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

OC sponsored two defined-contribution retirement plans for its employees:  the OC Savings Plan for salaried employees and the OC Savings & Security Plan for hourly employees (the Plans). Participants in the Plans could invest in several different investment funds, including the OC Stock Fund, which primarily invested in OC common stock.

Plan participants were provided with quarterly account statements, which reflected a participant's contribution history as well as the current value of the participant's investments.  These statements included a "Message from the Plan Administrator" about various Plan updates.  Summary Plan Descriptions (SPDs) for both the salaried plan and the hourly plan stated that the "Plan Administrator . . . is the Owens Corning Benefits Review Committee."  They also informed participants that the OC Investment Review Committee "is a Named Fiduciary" of the Plan.

The SPDs stated that "[t]he Plan is administered on Owens Corning's behalf by Fidelity Investments" and listed a contact telephone number for Fidelity.  Fidelity was also listed in the SPDs as the Plan Trustee.  The SPDs included several other references to Fidelity, the Investment Review Committee, and the Benefits Review Committee, stating that "[u]nder ERISA, the people responsible for operating the Plan are called 'fiduciaries.'  These individuals have an obligation to administer the Plan prudently and to act in the interest of Plan participants and beneficiaries."   The parties dispute how many of the Plaintiffs actually received SPDs, but Richard Tober, the head of Compensation and Benefits at OC, stated that the SPDs were periodically mailed to all hourly employees and that salaried employees were notified that the SPDs were available on the company's internet website.  In addition, Carol Lindhuber, a salaried employee and one of the named Plaintiffs, acknowledged that she was told where the electronic version of the Plan documents could be found.

OC was obligated under the Plans to partially match employee contributions. In the 1990s, the Plans mandated that all employer matching contributions and one-half of the employer profit-sharing contributions be invested in the OC Stock Fund. Beginning in 2000, however, employees were permitted to invest new OC contributions in any investment fund and could transfer portions of previous OC contributions to any other investment fund. OC's Compensation Committee decided in late September 2000 to close the OC Stock Fund to new investments and to permit participants to immediately transfer all prior OC contributions into other investment funds. Participants were notified of this change through a "Message from the Plan Administrator" on their account statements and by a letter sent from OC Chairman and CEO Glen Hiner on September 29, 2000 to all Plan participants. The letter listed a contact telephone number for the OC Compensation and Benefits Call Center as well as for Fidelity if participants had any questions about the change.

At the same time that these changes to the Plans were being made, OC was preparing to file for bankruptcy. Prior to 1972, OC had manufactured an industrial insulating product containing asbestos. OC began to face increased liability in the 1990s as a result of countless claims by those injured from asbestos exposure. Moreover, two Supreme Court cases in 1997 and 1999 severely limited the ability of asbestos manufacturers to settle claims against them through either a class action or a mass-settlement fund. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (asbestos class action); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (asbestos mass-settlement fund). As a result of the asbestos litigation and damage costs, OC filed for bankruptcy on October 5, 2000. CEO Hiner sent a letter on the same date to all OC employees, informing them of the bankruptcy filing and how it would affect their employment, compensation, and benefits.

OC stock began to significantly decline in value after the two Supreme Court cases were publicized. On the day that *Ortiz* was decided—June 23, 1999—the stock closed at $35.44 per share. By the end of 1999, the per-share price had dropped to $19.31, and in mid-2000 it closed at $9.25. The day before OC filed for bankruptcy, the

stock closed at $1.81 per share, and the day after, at $0.50. As a result of this steep decline in value, the OC Stock Fund lost tens of millions of dollars. Plaintiff Lindhuber eventually filed a proof of claim against OC in the bankruptcy proceedings in April 2002, seeking to recoup the losses that she had suffered in her retirement account.

**B.       Procedural history**

On September 1, 2006, Britton Brown and Sandra Brown filed a purported class-action lawsuit on behalf of participants in the Plans against the following defendants: the Plans themselves; the OC Investment Review Committee, which was a named fiduciary of the Plans; individual members of the OC Investment Review Committee; the OC Benefits Review Committee, which was the administrator for the Plans; individual members of the OC Benefits Review Committee; Tober; and several John Does who performed administrative functions for the Plans. (These parties will hereinafter be referred to as the OC Defendants.) OC itself was not named as a defendant.

The Plaintiffs alleged that by July 1, 1999, "when the impact of *Ortiz* would have sunk in, the Plans' fiduciaries knew or should have known that OC's asbestos liability threatened OC's future and that investing in OC stock was highly risky." Specifically, the Plaintiffs contended that the OC Defendants breached their fiduciary duties to both the Plans and the Plan participants by continuing to offer the OC Stock Fund as an investment option and by limiting the ability of participants to transfer previously invested funds out of the OC Stock Fund until the company was on the verge of bankruptcy. The Plaintiffs also alleged that the OC Defendants should have filed a proof of claim against OC during its bankruptcy proceedings. They brought suit under ERISA § 404, 29 U.S.C. § 1104, which requires plan fiduciaries to exercise a prudent standard of care when administering a plan, as well as ERISA § 405, 29 U.S.C. § 1105, which imposes liability on a fiduciary for breaches by a cofiduciary.

In December 2006, the Plaintiffs filed their first amended complaint, which added Lindhuber as a named plaintiff, Fidelity Management Trust Company as a

corporate defendant, and specific members of the Investment Review Committee as individual defendants. Fidelity was also sued as the trustee of the Plans. The Plaintiffs alleged that it violated ERISA § 404 by failing to protect Plan assets when Fidelity did not file a timely proof of claim against OC in the bankruptcy proceedings for the alleged breaches of fiduciary duties by the OC Defendants. On the other hand, the first amended complaint dropped the Investment Review Committee and the Benefits Review Committee as defendants.

In March 2007, the OC Defendants and Fidelity filed their respective motions to dismiss. In addition to other arguments, the OC Defendants contended that the Plaintiffs' claims were barred by ERISA's three-year statute of limitations. Fidelity joined that aspect of the OC Defendants' motion. In July 2007, the district court converted the OC Defendants' and Fidelity's motions to dismiss into motions for summary judgment on the issue of whether the Plaintiffs' claims were barred by ERISA's statute of limitations. It also permitted discovery on that issue. The district court denied summary judgment to all of the defendants in March 2008.

In April 2008, the Plaintiffs filed a second amended complaint, adding additional named Plaintiffs and alleging that the Plaintiffs did not know until 2006 or 2007 that "the Plans had fiduciaries, there was an Investment Review Committee, [and] fiduciaries were responsible for managing the Owens Corning Stock Fund." The OC Defendants subsequently filed a motion for reconsideration on the statute-of-limitations issue. This prompted the Plaintiffs to move for leave to file a third amended complaint. The proposed third amended complaint added additional OC Defendants and contained allegations that various OC officials had engaged in fraud to conceal the identities, duties, and fiduciary breaches of the Investment Review Committee members.

In December 2008, the district court granted the OC Defendants' motion for reconsideration, finding that all of the Plaintiffs' claims against the OC Defendants and against Fidelity were barred by ERISA's three-year statute of limitations. It also denied as moot the Plaintiffs' motion to file a third amended complaint.

In response, the Plaintiffs filed a motion to alter or amend the judgment, arguing that the district court erred in dismissing their claims against Fidelity without making separate findings regarding the Plaintiffs' actual knowledge of Fidelity's alleged breaches. They also contended that the court erred in granting summary judgment without first deciding the Plaintiffs' motion to further amend their complaint.

The district court granted in part the motion to alter the judgment, clarifying that it was dismissing the Plaintiffs' motion to amend their complaint on the basis that the motion was futile, not moot, and separately discussing why Fidelity was also entitled to summary judgment on the statute-of-limitations issue. A timely appeal was filed by the Plaintiffs regarding the district court's rulings on the motion for reconsideration and the motion to alter the judgment.

## II.  ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment. *ACLU of Ky. v. Grayson County*, 591 F.3d 837, 843 (6th Cir. 2010). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, the district court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

When a district court denies a motion for leave to amend a complaint because the proposed amendment would be futile, we also employ de novo review of such a decision. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 569 (6th Cir. 2003).

**B.      ERISA's statute of limitations**

ERISA's statute of limitations provides for three-year and six-year time periods during which a plaintiff may bring suit:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part . . . after the earlier of—
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. So even though an ERISA plaintiff alleging a breach of fiduciary duty generally has six years in which to file suit, "this period may be shortened to three years when the victim had 'actual knowledge of the breach or violation.'" *Wright v. Heyne*, 349 F.3d 321, 327 (6th Cir. 2003) (quoting 29 U.S.C. § 1113(2)).

Actual knowledge means "knowledge of the facts or transaction that constituted the alleged violation." *Id*. at 330. An ERISA plaintiff has actual knowledge when he or she has "knowledge of all the relevant facts, not that the facts establish a cognizable legal claim under ERISA." *Id*. at 328. In *Wright*, this court specifically rejected an interpretation of actual knowledge adopted by at least two other circuits that "requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim for breach of fiduciary duty or violation under ERISA." *Id*. at 327-28, 330 (quoting *Int'l Union v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 900 (3d Cir. 1992)).

**C.    The Plaintiffs' actual knowledge of the OC Defendants' alleged breaches**

The district court held that the Plaintiffs obtained actual knowledge sufficient to trigger the three-year period by October 2000. On appeal, the Plaintiffs contend that they did not have actual knowledge until 2006 or 2007, when they first learned "that the Plans had fiduciaries, that there was an Investment Review Committee (which was the named fiduciary for the Plans), and that fiduciaries were responsible for managing the OC Stock Fund."

But the Plaintiffs do not dispute that, by October 2000, they were aware of OC's bankruptcy filing and that their investment in the OC Stock Fund was virtually worthless. Moreover, as the district court correctly noted, the Plaintiffs were aware by October 2000 that "**someone** was exercising discretionary oversight of the Plan by altering transfer restrictions and thereby allowing greater diversification." (Emphasis in original.) This knowledge came from the message by the Plan Administrator on Plan participants' quarterly account statements for the period ending on September 30, 2000, as well as from CEO Hiner's September 29, 2000 letter, both of which explained the new rules on contributions to the OC Stock Fund. These communications gave Plan participants actual knowledge that they were not locked into that particular investment.

The Plaintiffs respond by contending that these changes merely related to Plan *amendment*, not Plan *management*. They thus argue that, at most, the Plaintiffs knew that someone had the authority to amend the Plans' terms. But this is a difference in semantics only. The communications informed Plan participants that someone had the authority to close the OC Stock Fund and to permit the participants to transfer prior contributions, which is the very solution that the Plaintiffs wanted, albeit a solution that they wanted many months before the OC stock became virtually worthless. They therefore knew that someone had the power to take steps to protect their Plan investments.

Moreover, at least some participants were provided with access to the SPDs, which *clearly* identified the OC Benefits Review Committee as the Plan Administrator

and the OC Investment Review Committee as a Named Fiduciary of the Plan. But the Plaintiffs argue that even if the Plan participants were provided with access to the SPDs, this, at most, would amount to *constructive* knowledge of the terms contained therein, not *actual* knowledge. We disagree. Actual knowledge does not "require proof that the individual Plaintiffs actually saw or read the documents that disclosed" the allegedly harmful investments. *See Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008) (holding that the plaintiffs had actual knowledge of an alleged failure to diversify plan investments when they were provided with plan documents that described the investments as undiversified, regardless of whether the plaintiffs "actually saw or read the documents"), *aff'd on other grounds*, 325 F. App'x 31 (2d Cir. 2009); *see also Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) (stating that Congress did not intend "the actual knowledge requirement to excuse willful blindness by a plaintiff"). The Plaintiffs attempt to distinguish these cases by arguing that they involved situations where plan participants were directly given plan documents, rather than, as is the case here, provided with information on how to access plan documents.

But we see no material distinction between being directly handed plan documents and being given instructions on how to access them. When a plan participant is given specific instructions on how to access plan documents, their failure to read the documents will not shield them from having actual knowledge of the documents' terms. *See Shirk v. Fifth Third Bancorp*, No. 05-cv-049, 2009 WL 3150303, at *3 (S.D. Ohio Sept. 30, 2009) ("[B]ecause Plaintiffs' actual knowledge runs from the date that documents were provided, *or made available*, to Plan Participants disclosing the facts underlying the alleged breach of fiduciary duty, Plaintiffs cannot avoid the bar of ERISA's three year statute of limitations by merely claiming that they did not read the documents that form the basis for their claims." (emphasis added)).

At oral argument, the Plaintiffs argued that the SPDs did not provide actual knowledge that the Plans had fiduciaries in charge of managing the OC Stock Fund because the SPDs state that OC's "Investment Review Committee has been delegated the authority to alter, adjust, eliminate, substitute or replace any or all of the Funds made

available to participants from time to time *(except the Owens Corning Stock Fund)*." (Emphasis added.) The Plaintiffs thus contend that this statement would have given Plan participants the impression that no one had the authority to get them out of the OC Stock Fund.

This contention is unavailing for two reasons. First, the argument that the SPDs would not have notified Plan participants that someone was exercising discretionary control over the OC Stock Fund is directly counter to their repeated assertion that the Plaintiffs gained actual knowledge when they allegedly first received the SPDs in August 2006. Second, any potential misconception that may have been created by this lone statement in the SPDs would have been cleared up when, in September 2000, Plan participants were notified that the OC Stock Fund was closed to new investments and that participants could transfer all prior OC contributions into other investment funds.

The SPDs and other Plan communications thus gave the Plaintiffs actual knowledge that someone was responsible for managing the Plans—i.e., that some individual or committee or entity was responsible for the decision to allow participants to continue to invest in the OC Stock Fund when the Fund was declining in value. So by October 2000, the Plaintiffs knew that they had been harmed by someone who had allegedly failed to adequately manage the Plans. These were all the "relevant facts" needed to trigger the start of the statute-of-limitations period. *See Wright v. Heyne*, 349 F.3d 321, 328 (6th Cir. 2003). Contrary to what the Plaintiffs argue, they did not need to know that the responsible parties were charged with fiduciary duties under ERISA. That is the type of legal conclusion rejected by this court in *Wright* as not necessary to a finding of actual knowledge. In any event, the Plaintiffs did receive notice that federal laws protected their investments. The October 5, 2000 letter from CEO Hiner notified all employees that "[a]ny investments you have in the company's profit sharing or 401(k) savings plans are . . . protected by federal regulations."

Nor did they need to know the specific identity or name of the responsible individuals or committees. Plaintiffs are permitted to bring suit against unnamed "John

Doe" defendants until discovery or other information reveals the identity of the party. *See, e.g.*, *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996). Indeed, the Plaintiffs filed their original complaint without any of the names of the members of the Investment Review Committee or the Benefits Review Committee. They could have therefore brought suit long before 2006 against "John Doe" as a placeholder for the individual or entity responsible for managing the Plans.

The Plaintiffs, however, contend that they needed to know more information to trigger the actual-knowledge requirement because the breach complained of in the instant case is a "stealth" breach, i.e., a *failure to act* to protect Plan participants from the decline in value of their investments in OC stock. To support this argument, they rely on *Brown v. American Life Holdings, Inc.*, 190 F.3d 856 (8th Cir. 1999), where the court stated in dicta that

> the nature of the alleged breach is critical to the actual knowledge issue. For example, if the fiduciary made an *illegal* investment—in ERISA terminology, engaged in a prohibited transaction—knowledge of the transaction would be actual knowledge of the breach. But if the fiduciary made an *imprudent* investment, actual knowledge of the breach would usually require some knowledge of how the fiduciary selected the investment.

*Id*. at 859 (emphasis in original).

But the *Brown* court used the Third Circuit's definition of actual knowledge, which has been specifically rejected by this court. *See Wright*, 349 F.3d at 328-30. Moreover, the plaintiff in *Brown* alleged that the plan trustees breached their fiduciary duties by investing plan assets in overly conservative investments and by taking too long to decide whether to terminate the plan and roll its assets into another plan. *Brown*, 190 F.3d at 858-59. Despite the court's statement in dicta, it ultimately held that "[t]he alleged failure to diversify, from Brown's perspective, was severe and apparent from an examination of the [Plan's] assets any time after October 20, 1994"—the date the Plan invested in the allegedly conservative funds. *Id*. at 859. The *Brown* court therefore rejected the plaintiff's argument that he did not have actual knowledge until he received

a letter in 1997 from the company vice president explaining that "there is no contemporaneous detailed explanation" for the decisions to invest in conservative investments. *Id*. at 860.

Thus, on closer examination, *Brown* does not support the Plaintiffs' argument. In the instant case, the alleged failure to eliminate the harmful effects of the investment in the OC Stock Fund would have been apparent in October 2000—when OC filed for bankruptcy and the stock value dropped well below one dollar per share. The Plaintiffs at that point were on notice that they had been harmed by the retention of OC stock in the OC Stock Fund.

In sum, the Plaintiffs allege that the OC Defendants breached their fiduciary duties to the Plaintiffs by their "failure to act to eliminate or otherwise minimize the harmful effects of an investment—the OC Stock Fund—that had become imprudent." But by October 2000, the Plaintiffs knew (1) that they had been harmed because their investments in OC stock had lost almost all value, and (2) that someone was acting to manage those investments. This knowledge was sufficient to trigger the three-year statute-of-limitations period. Because the Plaintiffs did not file their first complaint until September 2006, their claims against the OC Defendants are time-barred.

**D.     The Plaintiffs' motion for leave to amend**

While the OC Defendants' motion for reconsideration was pending, the Plaintiffs moved to file a third amended complaint. The proposed complaint contained allegations that various OC officials took steps "to hide the OC Defendants' breach of fiduciary duty, as well as to frustrate the efforts of any participant who might seek to bring suit for breach of the duty." As quoted above, the ERISA statute of limitations increases to six years "after the date of discovery" of the alleged breach or violation "in the case of fraud or concealment." 29 U.S.C. § 1113. The Plaintiffs presumably sought this amendment in an attempt to save their lawsuit.

ERISA's fraud exception to the statute of limitations "requires the plaintiffs to show (1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, (3) despite their exercise of diligence." *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994) (alteration in original) (citation omitted); *see also Schaefer v. Ark. Med. Soc'y*, 853 F.2d 1487, 1491-92 (8th Cir. 1988) (applying the same standard). The second element of this test is particularly critical in the present case because the majority of the actions that the Plaintiffs contend constituted fraud and concealment were taken at or after the time when the Plaintiffs gained actual knowledge in early October 2000 of the facts underlying the alleged breaches.

They allege, for example, that the pattern of fraud and concealment includes the letter from CEO Hiner on October 5, 2000 claiming that the company's bankruptcy filing "does not affect" participants' investments, a statement by Hiner on December 4, 2000 that nothing could be done to recoup losses from the OC Stock Fund, and an April 25, 2001 letter from Hiner stating that "[s]teps would be taken to change the 401(k) Plan in a positive direction." The Plaintiffs further contend that several participants asked questions in mid-October 2000 about their losses and whether the OC Stock Fund had been properly managed, but that no one at OC responded to these specific inquiries. Although OC did issue a general "Question and Answer" communication to all employees, the Plaintiffs contend that the answers did not inform the Plan participants that they had legal rights under ERISA or that Plan fiduciaries had breached their duties.

The Plaintiffs also claim that when the company made a $2.2 million restorative payment to participants in November 2000, various OC officials explained in a letter to Plan participants that the payment was "[b]ased on the unintended consequences [that] unit accounting had on the participants remaining in the Stock Fund." This explanation was misleading, the Plaintiffs argue, because the letter should have also informed the Plan participants that restorative payments are permitted by ERISA when a fiduciary's actions create a substantial risk of liability for breach of fiduciary duty. The Plaintiffs further claim that several of the OC Defendants were aware that they could face lawsuits

for breaches of their fiduciary duties because they discussed potential liability with outside counsel in October and November 2000.

None of these allegations, however, support a finding of fraud or concealment sufficient to invoke ERISA's six-year statute of limitations because the Plaintiffs were already on actual notice of the alleged wrongdoing—the failure to properly manage the Plans—when these acts occurred. *See Schaefer*, 853 F.2d at 1492 (stating that the fraud-or-concealment provision requires plaintiffs to show that, "despite their exercise of due diligence or care, they were not on notice of [a defendant's] breach of duty"). In other words, the OC Defendants could not have engaged in fraud to conceal from the Plaintiffs what the Plaintiffs already knew.

The one allegation that predates the Plaintiffs' actual knowledge is the claim that OC never informed Plan participants of the identities of the members of the OC Investment Review Committee during all relevant times (1999 to 2006), an action required by Plan language. This failure allegedly concealed the identity of the Committee members. But this sole allegation is insufficient to invoke the six-year statute of limitations period because, at most, it shows inaction on the part of OC and its officials and thus "does not rise to the level of active concealment, which is more than merely a failure to disclose." *See Schaefer*, 853 F.2d at 1491. "Concealment by mere silence is not enough." *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1094 (7th Cir. 1992) (citation omitted). The OC defendants must have engaged in "some trick or contrivance intended to exclude suspicion and prevent inquiry." *See id.* (citation omitted). The Plaintiffs' proposed amendment contains no such claims.

Because these allegations are not sufficient to invoke the fraud-or-concealment exception for ERISA's statute of limitations, the Plaintiffs' amendment would have been futile. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (holding that a proposed amendment is futile if the complaint, as amended, would not withstand a motion filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure to dismiss for failure to state a claim).  The district court thus did not err in denying the Plaintiffs' motion to amend.

**E.       Statute of limitations for Plaintiff Lindhuber**

We turn now to Lindhuber, one of the named plaintiffs in the instant action. Lindhuber filed a proof of claim against OC during its bankruptcy proceedings in April 2002 because she believed that OC was responsible for the losses in the OC Stock Fund. In June 2006, OC moved to disallow and expunge her claim.  The Plaintiffs now argue that the statute of limitations should be equitably tolled for Lindhuber for the time that her proof of claim was pending against OC.

Strictly defined, equitable tolling is "[t]he doctrine that if a plaintiff files a suit first in one court and then refiles in another, the statute of limitations does not run while the litigation is pending in the first court if various requirements are met." *Black's Law Dictionary* (8th ed. 2004).  We have found only one case where this court has equitably tolled ERISA's statute of limitations.  The court did so in *Farrell v. Automobile Club of Michigan*, 870 F.2d 1129 (6th Cir. 1989), because the plaintiffs there had timely filed suit in state court and the state court arguably had jurisdiction over the case because the plaintiffs' lawsuit could have been interpreted as seeking to recover accrued benefits under ERISA, "a claim for which federal jurisdiction is concurrent with state court jurisdiction." *Id*. at 1134.  Other courts have interpreted *Farrell* narrowly in declining to apply equitable tolling.  *See Shofer v. Hack Co.*, 970 F.2d 1316, 1319 (4th Cir. 1992) (interpreting *Farrell* to hold that equitable tolling of ERISA claims applies only where the state court's lack of jurisdiction was not clear); *Smith v. Eaton Corp.*, 102 F. Supp. 2d 439, 442 (W.D. Mich. 2000) ("This Court reads *Farrell* to apply equitable tolling only to claims over which state courts have concurrent jurisdiction.").

We analyze five factors in determining whether equitable tolling is justified: "1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness [in] remaining ignorant of the particular

legal requirement." *Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998). Equitable tolling is thus narrowly applied. *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 424 (6th Cir. 2009) (declining to apply equitable tolling where the plaintiffs did not exercise due diligence to discover their cause of action under the Real Estate Settlement and Procedures Act).

Applying the above factors to Lindhuber leads us to the conclusion that she did not lack notice of her rights under ERISA. Lindhuber acknowledged that she was told how to access Plan documents prior to 2003. She also said that she had "seen" the SPDs, but the record is unclear as to whether she had read them. The SPDs had two pages of information on participants' rights under ERISA, and they specifically stated that "[u]nder ERISA, the people responsible for operating the Plan are called 'fiduciaries.' These individuals have an obligation to administer the Plan prudently and to act in the interest of Plan participants and beneficiaries." The SPDs also had a chart listing the Plan Administrator and the Plan Fiduciary, as well as addresses and telephone numbers so that participants could contact these entities. Moreover, the October 5, 2000 letter from CEO Hiner, which was sent to all employees, notified them that their 401(k) savings plans were "protected by federal regulations."

Given these facts, Lindhuber did not lack notice of her right to file suit under ERISA. She thus had no basis to claim ignorance of ERISA as the proper avenue through which to pursue her claims. Equitable tolling is therefore not appropriate in the instant case.

**F.      Statute of limitations for the Plaintiffs' claims against Fidelity**

The Plaintiffs' final argument on appeal is that the district court erred in dismissing their claims against Fidelity pursuant to ERISA's statute of limitations. They claim that Fidelity breached its fiduciary duties as trustee of the Plans by failing to sue the other cofiduciaries on behalf of the Plans. The Plaintiffs contend that Fidelity had actual knowledge of a fiduciary breach by the OC Defendants when OC filed for bankruptcy in October 2000. All parties therefore agree that Fidelity's statute-of-

limitations period for bringing a suit against the cofiduciaries would have expired three years later, in October 2003. The Plaintiffs' claim against Fidelity thus accrued in October 2003, at which point no suit had been brought by Fidelity. But the Plaintiffs did not sue Fidelity until December 2006, so if the Plaintiffs had actual knowledge of the relevant facts regarding Fidelity's alleged breach before December 2003, their claim against Fidelity is time-barred.

All of the quarterly account statements in the record contain references to Fidelity and at least one specifically has a "Message from Fidelity." Moreover, the October 5, 2000 letter from CEO Hiner informs Plan participants that their 401(k) investments were "maintained in trusts separate from the company." Finally, the SPDs identify Fidelity as the trustee and were provided to at least some of the Plaintiffs. All of the Plaintiffs therefore had actual knowledge by October 2000 that Fidelity was intimately involved in the Plans and that the Plans were held in a trust, and at least some of the Plaintiffs knew that Fidelity was the trustee for the Plans.

Moreover, by October 2003, the Plaintiffs knew that no one had brought suit against OC on behalf of the Plans or the Plan participants and that their losses had not been recouped. This constitutes "knowledge of all the relevant facts"; i.e., their investments had suffered, Fidelity was significantly involved in managing the Plans, and no one had sued OC on behalf of the Plans. *See Wright*, 349 F.3d at 330. The Plaintiffs did not need to know that Fidelity was legally deemed a trustee or that, as such, it had a duty to sue the Plan fiduciaries. Because the Plaintiffs had actual knowledge of the relevant facts regarding Fidelity's alleged breach by October 2003, but did not file suit until December 2006, their claims against Fidelity are barred by ERISA's three-year statute of limitations.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

HELENE N. WHITE, Circuit Judge, concurring. I concur in all but Section II.C. of the majority opinion, as to which I write separately to identify two points of disagreement. I nevertheless concur in the ultimate conclusion of that section – that Plaintiffs had actual knowledge sufficient to trigger the statute of limitations.

I.

Plaintiffs argue that even after receiving the message from the Plan Administrator in the quarterly account statement for the period ending on September 30, 2000, and the September 29, 2000, letter from CEO Hiner, they still did not know that someone had discretionary oversight over the plans and could have worked to move their money from the OC Stock Fund sooner. They emphasize that the communications that explained the new rules on contributions to the OC Stock Fund relate to plan "amendment" rather than plan "management." The majority rejects this argument as presenting a mere semantic difference, concluding that "[t]he communications informed Plan participants that someone had the authority to close the OC Stock Fund and to permit the participants to transfer prior contributions. . . . They therefore knew that someone had the power to take steps to protect their Plan investments." (Opinion at 9.)

I must disagree. After reviewing the communications, I see nothing in them indicating that a fiduciary, charged to protect Plan participants' interests, was involved in the change in rules. The September 29th letter from CEO Hiner merely states that "the Compensation Committee of the Board of Directors has approved certain changes to your 401(k) Plan." (App. 115.) Thus, it appears that the change was effected by OC, not the Plan administrator or anyone acting to protect the participants. And, even assuming that the "the Compensation and Benefits Call Center," to which the letter directs any questions from Plan participants, is related to the Plan Administrator, the OC Benefits Review Committee, this provides no indication that the Plan Administrator

played any role in *bringing about* the changes. Similarly, the "Message From The Plan Administrator" in the quarterly account statement at issue simply states the new status quo: "Effective September 29, 2000[,] the Owens Corning Stock fund was closed to any new contributions or transfers into the fund. Additionally, all company contributions that were previously restricted are now available to be transferred to any of the other investment options offered in the plan." (App. 122.) These documents convey the message that Owens Corning alone had the authority to amend the plans, and that the company exercised that authority and then announced the unilateral change via the Plan Administrator. Thus, a plaintiff receiving this information would not necessarily have "kn[own] that someone had the power to take steps to protect their Plan investments." (Opinion at 9.)

II.

The majority also concludes that the SPDs provided Plaintiffs with actual knowledge that someone had the power to take steps to protect their Plan investments. I find the record insufficient to establish such notice as a matter of law, especially as to the salaried employees.

The majority observes that "at least some participants were provided with access to the SPDs." (Opinion at 9.) The evidence concerning Plaintiffs being provided SPDs comes primarily from the testimony of Richard Tober, head of Compensation and Benefits for OC. Tober testified that, with regard to hourly employees, SPDs were "periodically" mailed to participants, and that with regard to salaried employees, SPDs were "available online" and that their availability was "communicated to all employees." (R. 134-2 at 12-13.) Tober also testified that "some were at plant locations that would have been available." (R. 134-2 at 13.) In addition, one salaried-employee plaintiff said that she received a notice (apparently by email) about once a year that stated that a plan existed and "told you how to find the entire plan if you wanted to," though the notice did not contain a link to the entire SPD and she never actually looked up the entire SPD. (R. 54-20 at 15-16.) The majority concludes that this is sufficient to establish that Plaintiffs

had actual knowledge of the information contained in the SPDs: "we see no material distinction between being directly handed plan documents and being given instructions on how to access them." (Opinion at 10.)

Although I agree with the majority that a plaintiff's failure to read an SPD furnished to him (or other types of willful blindness) do not prevent a plaintiff from having actual knowledge of the information in the SPD, the record does not adequately establish that the SPDs were furnished to Plaintiffs. A helpful yardstick is provided by the ERISA statute and regulations that describe the publication and disclosure requirements that apply to SPDs. According to 29 U.S.C. § 1024(b),

> Publication of summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:
>
> > (1) *The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description*, and all modifications and changes referred to in section 1022(a)(1) of this title--

(emphasis added.) 29 C.F.R. § 2520 sheds some light on how an SPD must be "furnished" to a plan participant. *See Leyda v. AlliedSignal, Inc.*, 322 F.3d 199, 208 (2d Cir. 2003); *Gertjejansen v. Kemper Ins. Companies, Inc.*, 274 F. App'x 569, 570 (9th Cir. 2008). The regulation provides that "the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals." 29 C.F.R. § 2520.104b-1(b)(1). In particular, "[m]aterial which is required to be furnished to all participants covered under the plan . . . must be sent by a method or methods of delivery likely to result in full distribution." *Id*. This standard is high. For example,

> in-hand delivery to an employee at his or her worksite is acceptable. However, in no case is it acceptable merely to place copies of the material in a location frequented by participants. . . . Material distributed through the mail may be sent by first, second, or third-class mail. However, distribution by second or third-class mail is acceptable only if return and forwarding postage is guaranteed and address correction is

requested. Any material sent by second or third-class mail which is returned with an address correction shall be sent again by first-class mail or personally delivered to the participant at his or her worksite.

29 C.F.R. § 2520.104b-1(b)(1). With regard to electronic distribution, the administrator must

> (i) take[] appropriate and necessary measures reasonably calculated to ensure that the system for furnishing documents–
>
>> (A) Results in actual receipt of transmitted information (*e.g.*, using return-receipt or notice of undelivered electronic mail features, conducting periodic reviews or surveys to confirm receipt of the transmitted information) . . .

29 C.F.R. § 2520.104b-1(c)(1)(i) & (i)(A). In addition, the plan administrator must ensure that

> (iii) Notice is provided to each participant . . . at the time a document is furnished electronically, that apprises the individual of the significance of the document when it is not otherwise reasonably evident as transmitted (*e.g.*, the attached document describes changes in the benefits provided by your plan) and of the right to request and obtain a paper version of such document . . .

29 C.F.R. § 2520.104b-1(c)(1)(iii).

Thus, ERISA's requirements for furnishing SPDs to plan participants are quite demanding. It would be strange, indeed, for a plaintiff in an ERISA suit to be understood to have actual knowledge of the information in an SPD that was not sufficiently furnished to the plaintiff under ERISA's own standards. Because it is not clear from the record whether the ERISA requirements were met, I cannot conclude that there is no genuine issue whether Plaintiffs possessed actual knowledge of the information contained in the SPDs.

III.

Despite the above observations, I agree with the result of the majority opinion. Even without the SPD information, Plaintiffs knew that they had investments that were protected by ERISA's requirements.  And, by October 2000 they knew about the bankruptcy and knew that OC stock was nearly worthless.  They also knew that their investments had not been liquidated or moved to another fund before they had lost their value.  I understand these facts to be the "facts . . . that constituted the alleged violation" under this court's standard as articulated in *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003).